# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 08-21243-CIV-ALTONAGA/Brown

**LEAGUE OF WOMEN VOTERS**
**OF FLORIDA**, *et al.*,

       Plaintiffs,

vs.

**KURT S. BROWNING**, in his official capacity
as Secretary of State of the State of Florida; and
**DONALD L. PALMER**, in his official capacity as
Director of the Division of Elections within the
Department of State for the State of Florida,

       Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court for an evidentiary hearing commencing on June 18,

2008, upon Plaintiffs' Motion for Preliminary Injunction [D.E. 24].  Plaintiffs are nonprofit

organizations and a private citizen engaged in third-party voter registration activities in Florida.

Plaintiffs filed this suit challenging the constitutionality of Florida's recently amended statute

regulating the handling of voter registration applications by third-party voter registration

organizations.  *See* Fla. Stat. §§ 97.021(36), 97.0575 (2007) (the "Amended Law").  An earlier

version of the Amended Law, Fla. Laws 2005-277 § 7 (the "Original Law"), was found

unconstitutional, and its enforcement was preliminarily enjoined.  *See League of Women Voters of*

*Florida v. Cobb*, 447 F. Supp. 2d 1314, 1340 (S.D. Fla. 2006) ("*LWVF I*").  The parties and

underlying facts in *LWVF I* are substantially similar to those in this case.  Only the text of the

challenged legislation has changed.

Plaintiffs now seek a preliminary injunction barring Defendants from enforcing the Amended Law. The Court has carefully considered the parties' written submissions, their oral arguments, the testimony and evidence presented, and applicable law.

# I.  BACKGROUND

**A.     Parties**

**1.     Plaintiffs**

The League of Women Voters ("LWV") is a political advocacy group. (*See Complaint for Declaratory and Injunctive Relief* ("*Compl.*") [D.E. 1] at ¶ 15). The group's Florida affiliate, the League of Women Voters of Florida (the "Florida League"), is a non-partisan, not-for-profit corporation with over 2,800 members and 27 independent local leagues across the state. (*See Joint Proposed Findings of Fact in LWVF I* ("*Proposed Findings*") at ¶ 5).[1] The Florida League aims to promote political accountability and effective voter participation in government by

> (1) conducting voter registration drives throughout the state; (2) holding educational forums and candidate debates open to the public; (3) publishing a quarterly newsletter and hosting a website; (4) distributing both a non-partisan bi-annual election guide and objective information regarding proposed constitutional amendments in Florida; and (5) distributing information on certain issues and topics.

*LWVF I*, 447 F. Supp. 2d at 1318. Currently, the Florida League has imposed a moratorium on voter registration drives that will continue until the Amended Law is either enjoined or clarified. (*See Compl.* at ¶ 17).

---

[1]  At the evidentiary hearing, the parties stipulated that the Court could rely upon their joint factual statement presented in *LWVF I*.

The Florida AFL-CIO is an association of labor unions comprised of approximately 450 local unions throughout Florida, representing more than 500,000 active and retired paying members. (*See id.* at ¶ 19). It aims to improve the lives of working families in Florida by, *inter alia*, encouraging residents to register and vote so they may fully exercise their rights and responsibilities as citizens. *See LWVF I*, 447 F. Supp. 2d at 1319. The group conducts its registration drives through its local unions, which are governed by internal structures not under the control of the AFL-CIO. (*See Compl.* at ¶ 20). Generally, volunteers encourage members to vote by emphasizing the impact of decisions made by elected officials. *See LWVF I*, 447 F. Supp. 2d at 1319. The Florida AFL-CIO also claims it has suspended its voter registration drives in response to the Amended Law. (*See Compl.* at ¶ 22).

Marilynn Wills ("Wills") has been a member of the LWV for approximately 30 years, is currently on the board of directors of the Tallahassee League, and serves as vice president of the Florida League. (*See id.* at ¶ 26). Prior to 1995, Wills served as a volunteer deputy registrar conducting voter registration drives without the direct supervision of a supervisor of elections. *See LWVF I*, 447 F. Supp. 2d at 1320. Wills conducts voter registration activities and provides individuals with information about issues of concern, the Florida League, and early voting procedures. (*See id.*). She did not register voters in 2006 before the court in *LWVF I* entered its preliminary injunction and will not do so now unless the Amended Law is enjoined or clarified. (*See Compl.* at ¶ 26).

Wills and the LWV collect voter registration applications and submit them directly to the state voter registration officials. (*See Proposed Findings* at ¶ 17). During voter registration drives,

Florida League volunteers "hand out pamphlets, discuss the importance of registering to vote, provide information about voting, and inform new voters about how they can contact their elected officials." *LWVF I*, 447 F. Supp. 2d at 1318.  Some Plaintiffs routinely collect personal data from the voter registration applications by photocopying them.  (*See Proposed Findings* at ¶ 18).

### 2. Defendants

Kurt Browning is the Secretary of State for the State of Florida.  (*See Compl.* at ¶ 27).  As Secretary of State, he is Florida's chief elections officer.  *See* Fla. Stat. § 97.012.  Browning must "[o]btain and maintain uniformity in the interpretation and implementation of the election laws" and "[p]rovide uniform standards for the proper and equitable implementation of the registration laws." *Id.*

Donald Palmer is the Director of the Division of Elections ("Division").  (*See Compl.* at ¶ 28).  Under the Amended Law, Palmer has the authority to investigate violations of the law, assess civil fines, enforce the fines through legal Division of Elections proceedings, and adopt rules to administer the law.  (*See id.*) (citing Fla. Stat. § 97.0575(4)).

### B. Procedural Background

As stated, a previous version of the Amended Law was addressed by the district court in *LWVF I.*  The plaintiffs in *LWVF I* were the Florida League of Women Voters; People Acting for Community Together; Florida AFL-CIO; American Federation of State, County and Municipal Employees Council 79; SEIU Florida Healthcare Union; Wills; and John and Jane Does 1-100.  They filed suit against Sue M. Cobb, then-Secretary of State for the State of Florida; and Dawn Roberts, then-Director of the Division.  (*Proposed Findings* at ¶ 1).  The parties sought declaratory and

injunctive relief barring enforcement of the Original Law.[2]  On August 28, 2006, the court entered a preliminary injunction, concluding that the Original Law was unconstitutional.  *LWVF I*, 447 F. Supp. 2d at 1339-40.

While the decision in *LWVF I* was on appeal, the Florida Legislature enacted the Amended Law, which became effective on January 23, 2008.  Fla. Laws 2007-30 § 2.  The parties to *LWVF I* subsequently entered into a standstill agreement whereby Defendants agreed not to enforce the law. (*See Compl*. at ¶ 2).  On March 31, 2008, Defendants announced the termination of the standstill agreement and their intention to enforce the Amended Law.  (*See id.*).

On April 29, 2008, Plaintiffs filed the present action.  At a hearing on Plaintiffs' Emergency Motion for Temporary Restraining Order [D.E. 2], the parties agreed to a consent order temporarily halting enforcement of the Amended Law until a final rule implementing the statute is adopted and becomes effective pursuant to the Florida Administrative Procedure Act, Chapter 120, Fla. Stat. (*See Consent Order* [D.E. 15]).  Plaintiffs filed the present Motion on May 14, 2008.

## C.   Voter Registration in Florida

### 1.    Voter registration process

Prior to 1995, only state officials and individuals deputized by supervisors of elections as registrars were permitted to collect voter registration applications in Florida.  (*See Proposed Findings* at ¶ 11).  Individuals wishing to assist in the collection of voter registration applications had to "seek [an] appointment as a volunteer deputy voter registrar, reside in the particular county,

---

[2]  Plaintiffs also sought nominal damages against Defendants in their individual capacities, but these claims were dismissed by the court.  *See LWVF I*, 447 F. Supp. 2d at 1341.

and complete a training session." *LWVF I*, 447 F. Supp. 2d at 1317 (citation omitted).  In 1993 Congress passed the National Voter Registration Act ("NVRA"), which went into effect on January 1, 1994.  (*See Proposed Findings* at ¶ 11).  The NVRA's goal was to "increase the number of eligible citizens who register to vote in elections for Federal Office."  (*Compl.* at ¶ 45) (quoting 42 U.S.C. § 1973gg(b)(1)).  In 1995, Florida implemented the NVRA and began permitting third-party groups to collect voter registration applications.  (*See Proposed Findings* at ¶ 11).  The implementation increased political advocacy and gave unregistered citizens another means to register to vote.  *See LWVF I*, 447 F. Supp. 2d at 1317.

Voter registration in Florida is conducted by various government offices, individual citizens, and private groups.  (*See Compl.* at ¶ 30).  Florida election officials are also required by federal and state law to provide applications by mail and at designated locations, such as the Department of Highway Safety and Motor Vehicles, public libraries, and armed forces recruitment offices.  (*See id.*).  The applications may be submitted at any time during the year.  (*See Proposed Findings* at ¶ 15).  Upon collection, voter registration applications must be processed by state officials before a person is officially registered to vote.  (*See id.* at ¶ 12).  This process may only be completed by a supervisor of elections.  (*See id.*).

The supervisor of elections must review the applications for completeness, enter the data into the voter registration system, and ensure that voter information cards are properly made and distributed.  *LWVF I*, 447 F. Supp. 2d at 1317.  Voter registration applications must be submitted to state officials at least 29 days before an election for the voter to be registered to vote in that

election. (*See Proposed Findings* at ¶ 13). After this date, referred to as the "book-closing date," the voter registration process is effectively closed. (*See id.* at ¶ 15).

Although applications may be submitted at any time during the year, more applications are submitted immediately before the election book-closing date than at any other period. (*See id.*). In 2004, voter registration applications increased substantially nationwide. (*See id.* at ¶ 14). In 2004 in Florida, there were over 2.8 million new voter registration applications submitted; whereas in 2000, only 1.8 million new applications were submitted. (*See id.*). In fact, "over the past five presidential elections, there has been increased voter registration activity and interest in the period immediately preceding the book closing deadline . . . causing a predictable spike in the number of applications submitted at that time." *LWVF I*, 447 F. Supp. 2d at 1328.

### 2. Third-party voter registration legislation and *LWVF I*

In 2005, the Florida Legislature enacted the Original Law to regulate the processing, handling, and submission of voter registration applications by third-party organizations, excluding political parties. *See* Fla. Laws 2005-277 § 7. The Original Law took effect on January 1, 2006. The Original Law made third-party voter registration organizations and the individuals collecting the applications jointly and severally liable for failing to meet certain deadlines. *LWVF I*, 447 F. Supp. 2d at 1322. In relevant part, the Original Law provided:

> If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections, the individual collecting the voter registration applications, the registered agent, and those individuals responsible for the day-to-day operation of the third-party voter registration organization, including, if applicable, the entity's board of directors, president, vice president, managing partner, or such other individuals engaged in similar duties or functions, shall be personally and jointly and severally liable for the following fines:

(a) A fine in the amount of $250 for each application received by the division or the supervisor of elections more than 10 days after the applicant delivered the completed voter-registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf.

(b) A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, prior to book closing for any given election for federal or state office and received by the division or the supervisor of elections after the book closing deadline for such election.

(c) A fine in the amount of $5,000 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections.

Fla. Stat. § 97.0575 (3).

These penalties were "in addition to any applicable criminal penalties, including the provisions of Fla. Stat. § 104.0615(4) . . . ." *LWVF I*, 447 F. Supp. 2d at 1323.  The Original Law held "third-party voter registration organizations strictly liable for meeting the above deadlines." *Id.*  The Original Law, however, excluded from its coverage political parties that engaged in third-party voter registration activities.  *See id.* at 1322.

In *LWVF I*, the court concluded the Original Law was facially invalid under the First and Fourteenth Amendments because it impermissibly discriminated between political parties and all other third-party organizations, and the State had failed to identify any reason for this discrimination. *See id.* at 1336-37.  Additionally, the court ruled that although "Defendants . . . put forward compelling justifications for the law in general," they had "not  demonstrated that the combination of strict liability, heavy fines, and joint and several liability is necessary to ensure that third party organizations do not strip Florida citizens of their right to vote." *Id.* at 1337.

8

### 3.       The Amended Law

The Amended Law became effective January 2008.  In response to the court's concerns in *LWVF I*, the Florida legislature made substantial revisions to the Original Law, including: (1) significantly reducing the amount of fines; (2) implementing a $1,000 annual limit or cap on the amount of fines that may be levied against a "third-party voter registration organization, including affiliate organizations"; (3) removing the exception for political parties under the Original Law; and (4) adding a provision waiving the applicable fine upon "a showing that the failure to deliver the voter registration application promptly is based upon force majeure or impossibility of performance." Fla. Stat. §§ 97.0575(3)(a)-(c).

The Amended Law provides in relevant part:

If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections,  the third-party voter registration organization shall be liable for the following fines:

(a) A fine in the amount of $50 for each application received by the division or the supervisor of elections more than 10 days after the applicant delivered the completed voter-registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf. A fine in the amount of $250 for each application received if the third-party registration organization or person, entity, or agency acting on its behalf acted willfully.

(b) A fine in the amount of $100 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, prior to book closing for any given election for federal or state office and received by the division or the supervisor of elections after the book closing deadline for such election. A fine in the amount of $500 for each application received if the third-party registration organization or person, entity, or agency acting on its behalf acted willfully.

(c) A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on

9

its behalf, which is not submitted to the division or supervisor of elections. A fine in the amount of $1000 for each application received if the third-party registration organization or person, entity, or agency acting on its behalf acted willfully.

. . .

The aggregate fine pursuant to this subsection which may be assessed against a third-party voter registration organization, including affiliate organizations, for violations committed in a calendar year shall be $1,000.

. . .

The secretary shall waive the fines described in this subsection upon a showing that the failure to deliver the voter registration application promptly is based upon a force majeure or impossibility of performance.

*Id.*

Under the Amended Law the amount of fines will be reduced by three quarters if a third-party organization complies with certain reporting requirements. *See* Fla. Stat. § 97.0575(3). Compliance with these requirements, however, is not mandatory and the failure to report does not subject a third-party voter registration organization to any fines or criminal penalties. *See* Fla. Stat. § 97.0575(2).

While the Amended Law defines third-party voter registration organization as "any person, entity, or organization soliciting or collecting voter registration applications," Fla. Stat. § 97.021(36), it does not define "affiliate" for purposes of the $1,000 limit on fines. The State is in the process of conducting a rule-making proceeding to clarify the applicability of the cap and the definition of "affiliate." On May 12, 2008, Plaintiffs submitted written "Comments on Preliminary Draft Rule 1S-2.042; Third-Party Voter Registration Organizations" ("Comments"). Plaintiffs expressed their concerns that the Amended Law does not provide adequate guidance on the definition of "affiliate" or on the criteria governing when an individual will be considered part of a larger third-party voter registration organization rather than a separate organization.

10

Case No. 08-21243-CIV-ALTONAGA/Brown

In their Comments, Plaintiffs suggest language to clarify these issues. Plaintiffs also complain about language in the proposed rule requiring on-line disclosures of the names of the organizations that collect voter registration forms if the organization is not registered with the State, and the requirement for organizations to submit quarterly reports showing the precise locations, dates, and times of voter registration drives. The parties have requested that the Court issue a ruling on the constitutionality of the Amended Law prior to completion of this rule-making process.

**D.** **Testimony and Evidence Presented at the Hearing**

On June 18 and 19, 2008, the parties appeared before the undersigned for an evidentiary hearing. The parties presented both testimonial and documentary evidence and argued the merits of their positions. The parties also submitted deposition designations in support of their respective positions.

**1.** **Plaintiffs' Evidence**

In addition to submitting a written declaration in support of Plaintiffs' Motion, Cynthia Hall ("Hall"), President of the Florida AFL-CIO, testified that there are approximately 500,000 members and 450 local unions in her organization. (*See June 18, 2008 Transcript* ("*June 18th Tr.*") at 46:13-17). The Florida AFL-CIO is the conduit to the national AFL-CIO. (*See id.* at 47:7-13). The organization has an annual budget of about $1.5 million, with approximately $40,000 set aside in the present budget for voter registration activities. (*See id.* at 48:1-25).

The Florida AFL-CIO trains members who conduct registration activities on political issues that affect members' everyday lives. (*See id.* at 49:9-22). Volunteer members of the local unions are trained to educate unregistered local union members on why they should vote, which includes

11

instruction from attorneys on election law.  (*See id.* at 49:9-22, 53:10-18).  Training includes addressing the importance of timely submission of voter registrations, including the importance of training dates on primaries and general elections.  (*See id.* at 54:18-55:10).  Training sessions are held every year to instruct leaders on the process of voter registration, although this year there was no session.  (*See id.* at 50:17-51:9).  In Miami-Dade County, for example, voter registration takes place at approximately 350 to 400 work sites, and most volunteers approach people face-to-face to discuss the issues involved in an election and encourage the unregistered members to register to vote and fill out the voter registration form.  (*See id.* at 52:21-23, 59:24-60:23).  The forms are returned to the union hall where they are supposed to be checked before being mailed.  (*See id.* at 60:13-23).

As to the Amended Law, Hall testified she is fearful about the meaning of "affiliate," and concerned the organization may be responsible for over 300 affiliates and over 300 potential mistakes made by volunteers.  (*See id.* at 55:11-56:4).  Hall stated the prospect of fines is chilling members from engaging in voter registration, even though the law is not being enforced.  (*See id.* at 57:8-58:14).  To date, approximately ten to fifteen local unions have requested lists of unregistered voters from the organization; normally by this date most of the 450 locals would have requested the lists.  (*See id.* at 59:17-24).

Hall is unclear as to whether the fines provided for in the Amended Law will be imposed on the individual who performs the work, or the organization conducting the registration drive.  (*See id.* at 62:12-63:10).  If volunteers believe they can be personally fined, she opines it will be difficult to recruit volunteers, particularly where violations may occur without intentional wrongdoing.  (*See*

*id.*).  Moreover, the state-wide AFL-CIO may be collectively liable for fines imposed upon local unions and their volunteers.  (*See id.* at 65:4-66:7).

On two occasions, the Florida AFL-CIO has filed untimely quarterly reports regarding political action with the committee of continuous existence.[3]  (*See id.* at 73:17-76:24).  The group paid a fine of $2,000 the second instance, which occurred due to a new comptroller.  (*See id.* at 74:16-75:8).

Dianne Wheatley-Giliotti ("Wheatley-Giliotti"), a director of the LWV and former president of the Florida League, also testified at the evidentiary hearing in addition to submitting a written declaration.  Wheatley-Giliotti stated the major mission of the LWV is to engage people in the political process.  (*See id.* at 94:16-19).  As of January 31, 2008, the Florida League had 2,903 members.  (*See id.* at 96:15-17).  The Florida League's annual budget for voter registration activity is approximately $80,000, and each local chapter's annual budget averages approximately $5,000. (*See id.* at 97:21-23, 99:6-12).  Although the local leagues are separately incorporated, they pay a per member payment to the state and national leagues.  (*See id.* at 97:21-98:13).

One of the LWV's goals is to promote effective participation in government.  (*See id.* at 99:23-100:2).  The first step in getting people involved in the political process is to get them registered to vote.  (*See id.* at 100:3-15).  The LWV seeks to register anyone, but in particular, the focus is on people who are not likely to register of their own accord – the under-represented in the

---

[3]  A committee of continuous existence is organized under Section 106.04, Florida Statutes.  It must file regular reports of contributions and expenditures.  "Any committee of continuous existence failing to so file a report with the Division of Elections . . . on the designated due date shall be subject to a fine for late filing . . . ."  Fla. Stat. § 106.04(4)(b)(2).

political process.  (*See id.* at 100:16-101:2).  All of the registration drives are planned and executed by the local leagues' volunteer members.  (*See id.* at 102:17-19).  In registering people to vote, volunteers assist in the filling out of necessary forms, and answer questions prospective voters might have.  (*See id.* at 103:22-104:16).  A dialogue may ensue, including informing prospective voters about election dates and political issues.  (*See id.*).

Upon collecting registration forms, Florida League members either take them to the offices of the supervisors of elections or mail them at the first opportunity.  (*See id.* at 109:13-22).  It is possible for volunteers to collect voter application forms before the book-closing date but not submit them in a timely fashion.  (*See id.* at 110:1-111:11).  Wheatley-Giliotti is unaware of any volunteer submitting an application to a supervisor of elections more than ten days after having collected it, or not submitting one altogether.  (*See id.*).  As an example of how that may occur, however, she referenced the interruptions following a hurricane in Florida in 2005.  (*See id.* at 110:11-19).  Registration drives are held leading up to a major primary election or general election; as to students, the drives will most likely be in the spring, before graduation.  (*See id.* at 111:12-16).  Registration drives are most successful the closer they occur to the election.  (*See id.* at 111:17-112:1).

Wheatley-Giliotti finds the Amended Law vague; it is unclear what type of financial liability the Florida League might have, or what the potential financial liability of the local leagues or individuals participating in registration drives is.  (*See id.* at 112:20-114:12).  She believes Florida League members are afraid of being fined up to $1,000 for violations, and that the Amended Law is a barrier to getting people involved in the voting process.  (*See id.*).  The Florida League planned Project ROAR ("Reach Out and Register") from June 15 to June 22, in which the goal was to obtain

650,000 new voters for the 2008 election. (*See id.* at 115:14-116:22). The date was selected in light of fears that the Amended Law will become effective after that week. (*See id.*).

If the Amended Law becomes effective, the Florida League's Board of Directors will likely impose a moratorium on voter registration in the State of Florida because of the concerns surrounding the fines. (*See id.* at 118:19-119:11). She believes the Florida League does not have the staff to register under the Amended Law and comply with the quarterly reporting requirements. (*See id.* at 119:12-120:5). The Florida League monitors the local leagues to assure compliance with the annual filing requirement with the Florida Department of State. (*See id.* at 129:17-130:4). A penalty is imposed for untimely filing of the annual report. (*See id.* at 130:24-131:3).

Michael McDonald ("Professor McDonald"), associate professor at George Mason University, testified based on his examination of data he obtained from the Florida Division of Elections. Professor McDonald provided several graphs visually depicting consistency in spikes showing the registration of new voters at different times of the year over the time period of 1988 to 2004. The data leads him to conclude there is no evidence of a substantial number of registration forms being hoarded or withheld. (*See id.* at 154:1-17). However, the data from the voter registration files does not reflect the date registration forms were completed, so as to be able to determine if registrations entered into the system after book-closing date were in fact completed prior to book-closing. (*See id.* at 159:17-160:24). Professor McDonald also opined that people who

15

register closer to the book-closing deadline are more likely to turn out to vote than are people who register earlier. (*See id.* at 161: 2-7).[4]

Donald P. Green ("Professor Green"), professor of political science at Yale University, testified that members of the population who are unregistered to vote are frequently young and of low socio-economic status. (*See June 19, 2008 Transcript* ("*June 19th Tr.*") at 10:15-12:6). Part of what a registration and mobilization campaign attempts to do is motivate people to feel they are part of the political process and to become interested in the campaign around them. (*See id.* at 11:19-12:6). Community-based voter registration drives usually involve speech about political issues, including even the mere posting of a sign that reads "register to vote." (*See id.* at 12:7-13:22). Groups attempt to motivate people about the importance of elections, the importance of making their voices heard, and the significance of the electoral process. (*See id.*). Voter registration drives that distribute but do not collect voter registration forms are highly ineffective; it is hard to get people who have not registered to vote to register without some encouragement. (*See id.* at 14:4-15:15).

Professor Green concedes that, in his experience, canvassers collecting forms sometimes engage in registration fraud, particularly those who are new on the job. (*See id.* at 22:25-24:11). To the extent a state "ramps up" the fines for that behavior, he believes fraud may be reduced to some extent. (*See id.* at 44:3-16). However, according to Professor Green, the Amended Law mixes willful errors with incidental ones, producing negative effects. (*See id.*). He believes the carve-outs

---

[4] In his written "Expert Declaration of Michael P. McDonald" [D.E. 55-2], Professor McDonald concludes that the rate of new registrations throughout the calendar year and as the book-closing nears is relatively constant. (*Id.* at ¶ 14). He also concludes persons who registered on the book-closing date in 2004 are 7.6 percentage points more likely to have voted than persons who registered earlier in the calendar year. (*Id.*).

in the statute do not address this concern as he is unclear, for instance, whether the law would apply where "a box of completed cards [was] snatched by someone or . . . for some other reason you had them in your bag and off the whole thing went." (*See id.* at 36:11-13).

Professor Green concludes the likely effect of the Amended Law, which penalizes non-willful conduct, is to make it more difficult to recruit workers or volunteers to conduct the registration activity. (*See id.* at 44:3-16). In light of the uncertainty surrounding supervisors' individual liability, he believes the Amended Law will make it more difficult to find supervisors. (*See id.*). In Professor Green's opinion, the law will raise the costs of these campaigns, and reduce the effectiveness of third-party voter registration organizations. (*See id.*).

In addition to the foregoing testimony, Plaintiffs also rely on the Amended Declaration of Plaintiff Wills (*see Amended Declaration* ("*Wills Decl.*") [D.E. 24-4]), a 30-year member of the LWV, First Vice President of the Florida League, and member of the Board of Directors of the Tallahassee League. Wills is worried about being personally subjected to fines under the Amended Law, and states she will be forced to stop registering voters as a result of such fear. (*See Wills Decl.* at ¶ 4). In conducting registration drives, the Florida League distributes informational brochures about legislative amendments, gathers signatures for redistricting amendments, distribute brochures on early voting, and engages in conversations with prospective voters on the importance of voting. (*See id.* at ¶¶ 7-9). Because of the lack of paid staff, Wills and other similar volunteers collect voter registration forms and submit them on their own. (*See id.* at ¶ 14). Reduced fines for organizations that register with the State do not adequately address Wills' concerns with the Amended Law

because of the absence of paid staff to prepare the necessary forms involved with registration.  (*See id.* at ¶ 19).

Plaintiffs submit the Affidavit of Carol Smith ("Smith"), which is largely duplicative of the testimony and declarations provided by other Florida League representatives.  (*See Smith Aff.*).  Smith is a 19- year member of the Florida League, a member of the Broward League, and previously a 25-year member of the New York State League.  (*See id.*).  In addition to other leadership positions with various leagues, Smith is presently the Off-Board Candidate Forum Liaison.  (*See id.*).  While the Broward League trains its members regarding the completion of registration forms, it does not have paid staff, and consequently, the completed forms are not collected in a central location.  (*See id.*).  It is the responsibility of the supervisor of elections to notify applicants of incorrect or incomplete registration forms.  (*See id.*).  The Broward League, operating on an annual budget of less than $20,000, cannot afford to pay $1,000 in fines, and the burdensome nature of reduced fines for registered organizations provides no relief given the absence of paid staff to comply with the reporting requirements.  (*See id.*).  Smith states that if the Amended Law is not enjoined, it will chill the voter registration activities of the Broward League and its volunteers.  (*See id.*).

Ion Sancho ("Sancho") is the Supervisor of Elections for Leon County, Florida.  In his Affidavit, Sancho asserts that absent assistance from third-party registration groups, many lower-income and transient voters most likely will not register to vote.  (*See Sancho Affidavit*).  Because of the surge in voter registration in the weeks and months leading up to book-closing, he requires staff to work overtime and hires temporary staff for the period before book-closing until two weeks after book-closing.  (*See id.*).  Sancho has not had difficulty processing large numbers of voter

registration applications received close to the book-closing deadline. (*See id.*). In his opinion, "[t]he primary effect of the Amended Law will be to impose a major burden on third-party groups who wish to register voters." (*Id.*).

## 2.   Defendants' Evidence

Defendants presented no witnesses at the evidentiary hearing. Instead, they rely upon written declarations, testimony given at the trial in *Diaz v. Cobb*, 541 F. Supp. 2d 1319 (S.D. Fla. 2008),[5] deposition testimony of witnesses for whom Plaintiffs have also offered counter-designations, and other documents. The factual record presented by Defendants is summarized below.

Defendants submitted approximately thirteen written complaints received in 2004 by the Division of Elections relating to persons who registered to vote with third-party organizations, following which, these persons unsuccessfully attempted to exercise their right to vote. (*See Declaration of Records Custodian* [D.E. 49-2]). At the time of voting, the complainants were advised they were not registered to vote because the forms they had filled out had never been turned in. (*See id.*)

Defendants also rely upon a Settlement and Compliance Agreement [D.E. 65-2] between King County, located in the State of Washington, and the Association of Community Organizations

---

[5] The *Diaz* case involved a challenge by a group of voter applicants and third-party registration organizations to Florida's imposition of a book-closing deadline for new registration applications, 29 days before each state-wide election. In *Diaz*, the parties presented evidence and testimony that is substantially related to the issues raised in this matter. The *Diaz* court ultimately concluded that the book-closing deadline was not unconstitutional. Plaintiffs requested that the undersigned not rely upon any of the factual findings made by the district court in *Diaz*. However, pursuant to the parties' stipulation, certain evidence and testimony from the *Diaz* case were submitted to the Court for its consideration of the present suit.

for Reform Now ("ACORN"), related to the 2006 election cycle in King County.[6]  The Agreement applies to voter registration operations by ACORN, and contains many provisions similar to the provisions challenged in the Amended Law, as well as other, more onerous provisions regarding quality control minimum requirements for ACORN.  For example, ACORN agrees to submit voter registration forms within one week of the forms being completed and received, and agrees to pay a $250 penalty for late registrations, up to a maximum of $1,000 per late submission.  (*See id.* at 5). If ACORN does not submit voter registrations 30 days before an election, the registrations will not be processed.  (*See id.*).

Sarah Jane Bradshaw ("Bradshaw"), Assistant Director of the Division, states that since enactment of the Amended Law, no fewer than fourteen registration organizations have submitted paperwork in an effort to register with the Division to conduct voter registration drives.  (*See Decl. of Sarah Jane Bradshaw* [D.E. 61-2] at ¶ 5).  Her testimony in *Diaz* describes the receipt of thousands of voter registration applications the week before book-closing in the 2004 general election, and the efforts to send those applications to the individual counties so the counties could place the names on their voter registration system.  (*See Bradshaw Testimony* [D.E. 61-2] at 7-9).

In deposition testimony, Bradshaw indicated that in 2004 county supervisors told her some of the registration applications received had been completed by prospective voters prior to the book-closing for that year's primary election, but were not received until after the primary book-closing. (*See Deposition of Sarah Jane Bradshaw* ("*Bradshaw Dep.*") [D.E. 71-2] at 37:6-38:7).  Bradshaw

---

[6] Defendants have also submitted correspondence dated June 5, 2008, from Bill Cowles, Supervisor of Elections for Orange County, Florida, to ACORN, addressing problems with voter registration applications submitted by ACORN.  (*See* [D.E. 61-2] at 13).

did not recall receiving any complaints from voters unable to vote in the 2004 primary election due to late application submissions. (*See id.* at 38:9-22; 41:7-18). Some applications, however, were received after the book-closing deadline for the general election. (*See id.* at 38: 7-8). Bradshaw recalled at least one "if not multiple boxes of applications" received "the day after and maybe a couple of days after book closing." (*Id.* at 40:4-24). Bradshaw is unaware of any problems other than the 2004 experience that posed difficulties for the Division's processing of voter applications. (*See id.* at 66:11-18).

Buddy Johnson ("Johnson"), Supervisor of Elections for Hillsborough County, testified in the *Diaz* case that approximately 27,000 voter registration applications were delivered to his office in 2004 on the book-closing date. (*See Johnson Testimony* [D.E. 61-3] at 6-7). One of the groups responsible for dropping off the bundle of 27,000 applications was ACORN. (*See id.* at 7). Johnson hired additional temporary staff in September 2004 to assist in processing applications, he did not seek assistance from the Secretary of State, and he was not "overwhelmed by the volume" of voter applications received in his office. (*Deposition of Phillip E. Buddy Johnson* ("*Johnson Dep.*") [D.E. 71-3] at 78:21-79:6). He also testified the Amended Law requires the elections department to enter voter registration data within 13 days of receipt, and he was not concerned with meeting that deadline in 2008 as his office had accomplished it in 2004. (*See id.* at 78:21-80:3).

Evan Kolodny ("Kolodny"), former Director of Registration Services for the Broward County Florida Supervisor of Elections Office, testified in *Diaz* that over 20,000 applications were delivered at the last minute on book-closing day for the presidential election in 2004 (*see Kolodny Testimony* [D.E. 61-4] at 6), most of them from third-party groups conducting voter registration drives (*see id.*

at 7). Kolodny hired temporary workers to process the applications. (*See id.* at 9). According to Kolodny, ACORN submitted 2,800 or 3,000 voter applications to the Broward offices after the primary election in August 2004, applications which had been signed by the applicants the previous June and July. (*See Deposition of Evan Kolodny* ("*Kolodny Dep.*") [D.E. 71-4] at 85:20-86:1). The Broward office met with ACORN several times, and the organization did not submit additional forms after the book- closing deadline for the general election. (*See id.* at 93:21-92:2). "The only problem was that's the day they delivered them, book closing day." (*Id.* at 92:12-13). Kolodny testified that 5,000 to 20,000 forms came in on book-closing day, and most were from ACORN. (*See id.* at 93:17-18). A group called ACT may have also submitted voter registrations on book-closing day. (*See id.* at 93:20-25).

Ivy Korman ("Korman"), Deputy Supervisor of Elections for Miami-Dade County, testified in *Diaz* that her office received approximately 6,000 voter registration forms on book-closing day in 2004, and a total of approximately 10,000 right before book-closing. (*See Korman Testimony* [D.E. 61-5] at 8). In some instances the voter had signed the form several months before submission. (*See id.* at 9). In her experience, third-party groups have typically hoarded voter registration applications and delivered them to her office at the last minute. (*See id.* at 14). ACORN submitted at least 2,000 boxes of registration cards after the book-closing date in 2004, and Korman received approximately 20 calls from potential voters who did not get on the rolls. (*See Deposition of Ivy Korman* ("*Korman Dep.*") [D.E. 71-5] at 68:8-23; 69:8-21; 72:19-22). Korman recalled other occasions, without specificity, in which third-party organizations would turn in applications the day after the book-closing date. (*See id.* at 77:23-79:3; 80:8-24). On book-closing days, the office stays

Case No. 08-21243-CIV-ALTONAGA/Brown

open sometimes until midnight or closes at 5:00 p.m. or 9:00 p.m., depending on what the State instructs.  (*See id.* at 79:4-10).

Defendants also submitted the deposition testimony of Brenda Snipes ("Snipes"), a Supervisor of Elections in Broward County.  (*See Deposition of Brenda Snipes* ("*Snipes Dep.*") [D.E. 63-7] at 34:8-35:7)).  Snipes recalled third-party organizations submitting applications after the book-closing deadline for the primary election in 2004.  (*See id.* at 104:14-25, 106:7-107:7).  In instances where third-party voter registration organizations have held onto applications for long periods of time and then submitted them at the book-closing deadline, it has been "difficult, if not impossible" to resolve problems with incomplete applications.  (*See id.* at 140:1-20).

Finally, Robert Sweat, Supervisor of Elections for Manatee County, testified that third-party groups from outside his county had kept applications for weeks before turning them in, and then flooded the county at the last minute with applications, some of which contained addresses he could not match up with any database.  (*See Sweat Testimony* [D.E. 61-6] at 6).

    **E.**    **The Pleadings and the Motion for Preliminary Injunction**

        **1.**    **Vagueness**

Plaintiffs contend the Amended Law is vague and does not provide sufficient notice as to its enforcement and potential liability to organizations and their volunteers.  Plaintiffs claim the Amended Law is vague in two respects: (1) regarding when individual workers are personally liable for violations, and (2) regarding when an entity related to a third-party voter registration organization will be seen as a separate entity and thus be potentially liable for an additional $1,000 in fines.  (*See Compl.* at ¶¶ 67-68).

Plaintiffs assert the Amended Law is unclear as to an individual's personal liability for the $1,000 annual limit on fines, because the statutory requirements apply to each "third-party registration organization," which term includes "any person . . . soliciting or collecting voter registration applications." (*Id.* at ¶ 67). Plaintiffs assert it is not clear when an individual will be treated solely as a "third-party registration organization" or as part of a larger organization. (*Id.* at ¶ 68).

Plaintiffs argue the Amended Law is unclear as to when individual entities related to third-party registration organizations will be treated as a separate "affiliate" entity for purposes of the $1,000 annual cap. Plaintiffs contend the statute is vague because it fails to define "affiliate organizations" or give any indication concerning when an organization will be considered an "affiliate" of another organization.

Plaintiffs also assert the Amended Law will result in arbitrary or discriminatory enforcement. Plaintiffs are concerned that because of its alleged ambiguities, the Amended Law may result in inconsistent linedrawing within and among electoral districts, as well as heavier fines on disfavored groups. Specifically, they argue Division officials could determine that a single cap exists for some entities and rule otherwise for less favored groups. Furthermore, Plaintiffs argue the risk of arbitrary enforcement is compounded by the discretion granted to state officials to decide which potential violations to investigate.[7]

---

[7] Section 97.0575(4)(b), Florida Statutes, states: "The division *may* investigate any violation of this section." (emphasis added). Plaintiffs contend this provision makes enforcement of the Amended Law too discretionary.

Case No. 08-21243-CIV-ALTONAGA/Brown

### 2.     Unconstitutional Burden on Political Speech and Association

Plaintiffs further allege that in addition to being unconstitutionally vague, the Amended Law restricts their rights of free speech and association, protected by the First Amendment. Specifically, Plaintiffs contend the vaguely worded Amended Law puts them at risk of severe fines due to its near strict liability. They submit the Amended Law does not make any exceptions for innocent mistakes or potential state misconduct. As such, they argue it imposes liability on organizational plaintiffs for other people's conduct, even when the organizational plaintiffs have no knowledge the law was violated. (*See Compl.* at ¶ 76). Plaintiffs submit that the "force majeure" or "impossibility of performance" exceptions cover only extraordinary events and thus do not appreciably mitigate the harm caused by the near strict liability. (*See id.* at ¶ 78).

Plaintiffs allege the severe fines could potentially place the organizations and individuals in a ruinous financial situation. (*See id.* at ¶¶ 81-82). Individuals may be deterred from volunteering due to the risk of personal financial liability (*see id.* at ¶ 84), and the threat of severe fines may cause Plaintiffs to cease their voter registration drives (*see id.* at ¶ 86).

### 3.     Grounds for Preliminary Injunction

Plaintiffs contend the Amended Law's vagueness has forced them to cease their voter registration drives. Furthermore, they argue the Amended Law has impermissibly "chilled" their First Amendment rights and will negatively affect general voter registration and, in particular, will affect those who rely on Plaintiffs to participate in the political process most harshly, such as disabled persons and members of low-income communities. Plaintiffs assert the State's interests offered in support of the Amended Law are not sufficient to justify the burdens on Plaintiffs' rights.

For all of these reasons, Plaintiffs request this Court to enjoin Defendants from enforcing the Amended Law.

## II.  <u>LEGAL STANDARD</u>

To prevail on a motion for temporary restraining order or preliminary injunction, Plaintiffs must show:

> "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest."

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002)).  "It is well established in this circuit that '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to all four elements."  *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

As to the first element, substantial likelihood of success on the merits, the Court is mindful that Plaintiffs raise a facial challenge to the Amended Law.  The Supreme Court recently stated "[f]acial challenges are disfavored" because they "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records' . . . , run contrary to the fundamental principle of judicial restraint . . . [and] . . . threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184,

1191 (2008) (internal citations and quotations omitted). Courts "must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)). Thus, Plaintiffs bear a heavy burden in demonstrating a substantial likelihood of success on their facial challenge to the Amended Law. *See Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1621 (2008) ("Given the fact that petitioners have advanced a broad attack on the constitutionality of [the election provision], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion.").

### III.  ANALYSIS

#### A.    Due Process and the Unconstitutionally Vague Argument

Again, Plaintiffs contend the Amended Law is unconstitutionally vague in that it fails to make clear whether or when an individual will be held personally liable for submitting voter registration applications outside the mandated time periods, and whether an individual working as part of a larger registration organization will "receive the benefit of the $1,000 cap on fines for that group." (*Compl.* at ¶ 67). Plaintiffs also argue the Amended Law is vague because the Florida legislature failed to define "affiliate organization" in establishing the annual cap on aggregate fines a third-party voter registration organization may incur. (*See id.* at ¶ 68). Before turning to these claims, the undersigned first addresses the applicable standard.

#### 1.    Legal Standard

A statute is unconstitutionally vague if citizens "of common intelligence must necessarily guess at its meaning." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The void-for-

vagueness doctrine rests upon basic principles of due process. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The doctrine "incorporates notions of fair notice or warning," *Smith v. Goguen*, 415 U.S. 566, 572 (1974), designed to prevent the innocent from being trapped "by failing to give fair notice of what is prohibited." *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1329 (11th Cir. 2005). The doctrine also requires lawmakers to "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Smith*, 415 U.S. at 572; *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (suggesting the most important aspect of the vagueness doctrine may be the requirement that legislatures establish minimal guidelines to govern law enforcement).

Traditionally courts will only strike down a statute on a facial challenge for vagueness if the statute is "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). However, a higher standard of certainty is demanded when a statute reaches a substantial amount of constitutionally protected conduct or when it is penal in nature. *See Kolender*, 461 U.S. at 358 n.8 (citations omitted). Courts have concluded that "where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms" because citizens will "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (internal quotations and citations omitted). "'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432-33 (1963)). Courts find laws

impinging on speech rights to be vague when they create a "regulatory maze," *Keyishian*, 385 U.S. at 604, are ambiguous, *Nat'l Ass'n for Advancement of Colored People*, 371 U.S. at 432, are "completely lacking in . . . terms susceptible of objective measurement," *Cramp*, 368 U.S. at 286, or when the wording is "aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules," *Keyishian*, 385 U.S. at 604.

On each of their vagueness claims, to be entitled to a preliminary injunction, Plaintiffs must persuade the Court that (1) the Amended Law fails to provide fair notice of prohibited conduct; and (2) the Amended Law fails to provide reasonably clear guidelines to law enforcement and triers of fact so as to deter arbitrary and discriminatory enforcement. *See Kolender*, 461 U.S. at 357-58.

Plaintiffs argue the Court should employ the higher degree of certainty standard in examining their vagueness challenges because the Amended Law reaches First Amendment rights to speech. As discussed in this Order, the Amended Law regulates Plaintiffs' handling of voter registration applications after their collection, only indirectly impacting Plaintiffs' protected activities. However, in an abundance of caution and giving wide berth to the freedoms afforded by the First Amendment, Plaintiffs' vagueness challenges are considered here using the higher standard of certainty required of laws regulating speech.

### 2.    Conduct Addressed by the Amended Law

Florida Statute Section 97.021 sets out a litany of 43 definitions to be used "[f]or the purposes of this code, except where the context clearly indicates otherwise . . . ."  A third-party registration organization is a person, entity, or organization soliciting or collecting voter registration

applications. Fla. Stat. § 97.021(36). The Amended Law specifically excludes two categories of persons from the definition of a third-party organization: those seeking to register or collect applications from their spouse, child or parent, and those registering or collecting applications as employees or agents of specifically named state agencies or a voter registration agency.[8] Fla. Stat. § 97.021(36)(a-b).

The phrase "third-party voter registration organization" appears 19 times in the Amended Law. Plaintiffs argue it is vague because it is unclear whether organizations, individuals, or both individuals and organizations will be subject to fines in the event a voter application is submitted outside the statutorily-mandated time constraints. *See* Fla. Stat. § 97.0575(3). Section 97.021(36), however, could not be any plainer in defining who is and who is not a "third-party registration organization;" *any person*, *any entity*, or *any organization* engaged in soliciting or collecting voter registration applications is embraced by the definition, subject to the two specified exclusions set forth above.

Under the Amended Law, a third-party voter registration organization is liable for fines "[i]f a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections." Fla. Stat. § 97.0575(3). Substituting the statutory definition of "third-party voter registration organization," the statute would read as follows: "If a voter registration application collected by any person, entity or organization soliciting or collecting voter registration applications is not promptly delivered to the division or supervisor

---

[8] As stated, in addressing the concerns in *LWVF I*, the Florida Legislature amended this subsection by eliminating the exclusion afforded to political parties.

of elections, [the] person, entity or organization soliciting or collecting voter registration applications shall be liable for the following fines."

The unequivocal thrust of the Amended Law, therefore, is to hold *all* parties involved in soliciting or collecting voter registration applications liable.  Thus, individuals, entities and organizations are clearly put on notice that their conduct, as it regards soliciting or collecting voter registration applications, is regulated by Florida law.  Similarly, there is no ambiguity as to precisely what conduct is prohibited by the legislation: failing to timely submit collected voter registration applications to the supervisor of elections within the time periods or before the deadlines specified by the Florida legislature.

Plaintiffs also point to the language in sub-subsections (3)(a) through (c) of the Amended Law as a source of vagueness.  These three clauses delineate the time constraints for submitting registration applications and the corresponding fines.  In each of the sub-subsections, the phrase, "a third-party voter registration organization or any person, entity, or agent acting on its behalf" is used. Inserting the definition of a third-party organization, the statute simply builds in added redundancy, to wit: any person, entity, or organization, or any person, entity, or agent acting on its behalf, is liable.  While this linguistic redundancy is undoubtedly improper, its shortcomings do not lessen the statute's clarity.  If anything, the redundancy gives individuals heightened notice of the conduct they are prohibited from engaging in: the very same conduct the organizations they represent are also prohibited from engaging in.

Not only must citizens be provided notice of prohibited conduct, but the law must also provide law enforcement and triers of fact with clear guidelines so as to prevent arbitrary and

discriminatory enforcement.  *See Kolender*, 461 U.S. at 357.  Although Plaintiffs may dispute the

equity or wisdom of holding individuals as well as organizations liable, the clarity of the Amended

Law concerning who is a third-party voter registration organization and who is liable for fines is

sufficient to alleviate concerns regarding arbitrary or discriminatory application of the law.

### 3.     Affiliate Organizations

Plaintiffs also contend the Amended Law is vague because it fails to define "affiliate

organizations."  Section 97.0575(3)(c) sets a $1,000 annual cap on the maximum penalty that may

be assessed in any one year against third-party voter registration organizations and extends the

benefit of that cap to the "affiliates" of third-party voter registration organizations.  Plaintiffs contend

the use of the term "affiliate" is vague because it makes it impossible to determine who actually

benefits from the cap.  The term "affiliate," however, has a common meaning or understanding that

requires little more investigation than the use of a standard dictionary.  The *American Heritage

College Dictionary* defines affiliate as "a person or an organization associated with another as a

subordinate, subsidiary, or member." (3rd ed. 1997).  *Black's Law Dictionary* puts a business spin

on affiliate, defining it as "a corporation that is related to another corporation by shareholdings or

other means of control; a subsidiary, parent or sibling corporation," or "one who controls, is

controlled by, or is under common control with the issuer of a security."  (8th ed. 2004).

That the term "affiliate" has a common meaning requiring no exposition is reinforced by the

fact that the terms "affiliate" and "affiliates" appear over 240 times in a wide range of Florida

statutes, yet the terms merit explicit definitions in fewer than 20 sections of the state code. Where

"affiliate" is defined by statute, the law either specifies a quantifiable relationship[9] or tailors the common definition of affiliate to the industry under regulation.[10]   In both cases, the heart of the definition is the same: an affiliate is a person who, or entity which owns or exercises control over or is controlled by, directly or indirectly, another person or entity.

Use of the term "affiliate" in the Amended Law does not create a "regulatory maze," *Keyishian*, 385 U.S. at 604, or render the Amended Law ambiguous, *Nat'l Ass'n for Advancement of Colored People*, 371 U.S. at 432.  The Amended Law clearly establishes an annual cap of $1,000 in fines on any "third party registration organization," be it an individual, entity, or organization,"including affiliate organizations."   As a result, the local chapter of a statewide organization, which in soliciting and collecting voter registration applications repeatedly fails to abide by the timetables established by the law and incurs more than $1,000 of fines within one year, will nevertheless enjoy the benefits of the $1,000 annual cap on the group that includes that chapter, and any organizations or entities that, or individuals who, are controlled by it or exercise control over it.  Undoubtedly the determination of what constitutes an affiliate will be a fact-specific inquiry, but Plaintiffs are in the best position to understand the relationships between the various parties conducting voter registration drives and whether they are properly deemed affiliates.  That Plaintiffs

---

[9]   *See, e.g.*, Fla. Stat. §§ 280.02(1) (defining affiliate as an entity related through a parent corporation's controlling interest); 288.99(3)(a) (defining an affiliate of an insurance company as one holding 15 percent or more in voting securities); 526.303(1) (specifying an affiliate as any person whose stock is more than 50 percent owned by any refiner).

[10]   *See, e.g.*, Fla. Stat. §§ 280.02(1) (Security for Public Deposits); 288.99(3)(a) (Affiliate of an insurance company); 494.0079(1) (Florida Fair Lending Act); 517.021(1)(Securities Transactions); 736.0103(1) (Florida Trust Code).

33

believe this definition of affiliate may not be broad enough does render the statute unconstitutionally vague.

In sum, Plaintiffs' contentions highlight only that the Amended Law may have been more artfully worded, but fail to identify any unconstitutional vagueness. Courts have long noted the "limitations in the English language with respect to being both specific and manageably brief . . . ." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 578-79 (1973). "Words inevitably contain germs of uncertainty . . . ." *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973). It is only natural for legal adversaries to wrestle over the meanings of words and phrases of the law in their efforts to prevail:

> There is little doubt that imagination can conjure hypothetical cases in which the meaning . . . will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important.

*Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 412 (1950).

Linguistic scrimmages aside, legislation is often not as clear or as precise as citizens, judges, and even lawmakers would like it to be, and it often suffers from ambiguities wrought by the legislative process. "[T]he subject-matter [of a statute] may be such that only a general scheme or policy can with advantage be laid down by the Legislature; and the working out in detail of the policy indicated may be left to the discretion of other officers or tribunals." *State ex rel. Young v. Duval County*, 79 So. 692, 697 (Fla. 1918). For that reason, Florida legislators, like their state and federal counterparts, often "expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its

expressed general purpose." *Conner v. Joe Hatton, Inc.*, 216 So. 2d 209, 211 (Fla. 1968) (quoting *State v. Atlantic Coast Line R. Co*, 47 So. 969, 976 (Fla. 1908)). The Florida legislature has granted such an authorization with regard to the regulation of third-party voter registration activities under the Amended Law. It has intentionally delegated to the Division the authority to adopt rules to administer this statute. *See* Fla. Stat. §§ 97.0575(4)(a) and (8). Notably, Plaintiffs do not wish to await the conclusion of that process with respect to the Amended Law.

It is not the Court's role to rewrite legislation that may be poorly worded. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 281 (1984) (observing that it is irrelevant whether preventative detention statute "could have been better drafted to improve the quality of the decisionmaking process" because the court's role is limited to determining whether the system set forth by the statute "comports with constitutional standards"). While the Amended Law suffers from redundancy, its grammatical imperfections do not frustrate its clarity of purpose, the notice afforded to citizens, and the guidelines requisite for fair and impartial enforcement. *U.S. v. Kattan-Kassin*, 696 F.2d 893, 896 (11th Cir. 1983) (although a criminal statute "could have been better drafted to explicitly indicate that the maximum penalty applies to each violation," such a lack of clarity does not lead to an absurd result). Measured against the standards of "common intelligence," *Connally*, 269 U.S. at 391, and an "ordinary person exercising ordinary common sense," *U.S. Civil Serv. Comm'n*, 413 U.S. at 579, the Amended Law provides fair notice to those who would engage in voter registration activities in the State of Florida and establishes clear guidelines for enforcement sufficient to avoid arbitrary and discriminatory application. For these reasons, Plaintiffs have not demonstrated a likelihood of success on their claim of facial vagueness.

35

**B.      Whether the Amended Law Unconstitutionally Burdens Plaintiffs' Core Political Speech**

The second argument in favor of a preliminary injunction is that the Amended Law unconstitutionally burdens Plaintiffs' "core political speech" and rights to free association. Plaintiffs assert the Amended Law should properly be evaluated under the standard set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Defendants, in turn, argue that the Supreme Court has traditionally "extended First Amendment protection only to conduct that is inherently expressive" and the collection and handling of voter registration applications does not fit that description. *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006). The undersigned agrees that the collection and handling of voter registration applications is not inherently expressive activity. However, for purposes of the present analysis, the Court accepts the characterization of the Amended Law as an election regulation and evaluates it under the *Anderson* standard.

The Supreme Court has recognized that "'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Anderson*, 460 U.S. at 788 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Furthermore,

> [t]o achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends. Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

36

*Id.* (footnote omitted).

In *Anderson*, the Supreme Court observed that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." 460 U.S. at 789 (citation omitted). Instead, in evaluating a challenge to an election law, a federal court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Id.* Next, it "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* And "[i]n passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

### 1.    Character and Magnitude of the Asserted Injury

Under the *Anderson* test, the Court must first evaluate the severity of the potential injury posed to Plaintiffs by the Amended Law. This determination is critical to determining the appropriate level of constitutional scrutiny to apply. "Election regulations that impose a severe burden on associational rights are subject to strict scrutiny," and courts should "uphold them only if they are 'narrowly tailored to serve a compelling state interest.'" *Washington State Grange,* 128 S. Ct. at 1191 (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (additional citations omitted)). However, "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "If a statute imposes only modest burdens . . . then 'the State's important regulatory interests

are generally sufficient to justify reasonable, nondiscriminatory restrictions' on election procedures." *Washington State Grange*, 128 S. Ct. at 1191 (quoting *Anderson*, 460 U.S. at 788). Thus, "[l]esser burdens . . . trigger less exacting review . . . ." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Indeed, the Supreme Court has "'repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls.'" *Washington State Grange*, 128 S. Ct. at 1192 (quoting *Burdick*, 504 U.S. at 438).

Relying upon the Supreme Court's decision in *Meyer v. Grant*, 486 U.S. 414 (1988), Plaintiffs contend the Amended Law should be subject to strict constitutional scrutiny because it severely burdens their First Amendment rights. Specifically, they contend that because the imposition of fines is likely to "chill" Plaintiffs' willingness to engage in the solicitation of new voters and the collection of new voter registration applications, the Amended Law severely burdens their "core political speech." In *LWVF I*, the court determined that, "as in *Meyer*, the [Original Law] . . . reduced the total quantum of speech . . . [since] . . . Plaintiffs, all of whom are dedicated to increasing voter registration and voting, have shut down their voter registration drives because of the Law's heavy, strict, and joint and several liability penalties." *LWVF I*, 447 F. Supp. 2d at 1332-33. Plaintiffs contend the severity of the injury posed by the Amended Law is nearly identical to the danger posed by the Original Law and, thus, strict scrutiny is appropriate.

As an initial matter, the nature of the burden imposed upon Plaintiffs' political speech by the Amended Law is substantially different from that imposed by the statute addressed in *Meyer,* or the one addressed in another decision upon which Plaintiffs rely, *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980). In *Meyer*, the Supreme Court applied strict constitutional

scrutiny to a state regulation prohibiting organizations from paying individuals to circulate petitions for ballot initiatives to amend the state's constitution.  The Court determined that the "refusal to permit appellees to pay petition circulators restricts political expression in two ways: [by] limit[ing] the number of voices who will convey appellees' message and . . . mak[ing] it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422-23.  Notably, the statute at issue in *Meyer* directly regulated the conditions under which plaintiffs could interact with members of the public regarding an issue of political concern.  Similarly, in *Schaumberg*, the Court applied heightened constitutional scrutiny to a statute that prohibited door-to-door or on-street solicitation of contributions by charitable organizations which did not use at least 75% of their receipts for what were deemed to be charitable purposes.  444 U.S. at 639.  As in *Meyer*, the statute in *Schaumberg* placed specific preconditions on plaintiffs' exercise of their First Amendment rights.

 *Burdick*, however, which applied the *Anderson* balancing test, declined to apply a heightened level of constitutional scrutiny to an electoral statute prohibiting the use of write-in ballots because "in light of the adequate ballot access afforded under Hawaii's election code, the State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote." *Burdick*, 504 U.S. at 438-39.  In her concurring opinion in *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 215 (1999), Justice Sandra Day O'Connor observed that *Meyer* stands for the proposition "that regulations directly burdening the one-on-one,

communicative aspect of [electoral activity] are subject to strict scrutiny." *Id.* (citing *Meyer*, 486

U.S. at 420).  She went on to note that:

> [u]nder the *Burdick* approach, the threshold inquiry is whether [the election regulations at issue] directly and substantially burden the one-on-one, communicative aspect of petition circulation or whether they primarily target the electoral process, imposing only indirect and less substantial burdens on communication.  If the former, the regulation should be subject to strict scrutiny.  If the latter, the regulation should be subject to review for reasonableness.

*Id.* at 216.

Consistent with this approach, the Supreme Court has applied heightened constitutional

scrutiny to electoral regulations that directly or substantially burden First Amendment activity, s*ee,*

*e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (holding Ohio statute that prohibits

the distribution of anonymous campaign literature unconstitutional), while applying a more relaxed

standard to electoral regulations which do not place a direct or substantial burden on First

Amendment rights, *see, e.g.*, *Timmons,* 520 U.S. at 363 (applying relaxed standard of constitutional

scrutiny to uphold Minnesota law that banned fusion candidacies because it did "not restrict the

ability of [plaintiffs] to endorse, support, or vote for anyone they like" or "directly limit [their] access

to the ballot").

Undoubtedly, Plaintiffs' interactions with prospective voters in connection with their

solicitation of voter registration applications constitutes constitutionally protected activity.  However,

and in contrast to both *Meyer* and *Schaumberg*, the Amended Law does not place any direct

restrictions or preconditions on those interactions.  For instance, it does not place any restrictions on

who is eligible to participate in voter registration drives or what methods or means third-party voter

registration organizations may use to solicit new voters and distribute registration applications. Instead, the Amended Law simply regulates an administrative aspect of the electoral process – the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants. Thus, the impact of this regulation on Plaintiffs' "one-to-one, communicative" interactions with prospective voters is far more indirect and attenuated than the statute addressed in *Meyer*.

While it is certainly still possible that the indirect restrictions imposed by this type of regulation may be so significant that the law will have the effect of placing a severe burden on Plaintiffs' protected political speech, it is not the case that heightened constitutional scrutiny is always or even generally appropriate in such circumstances. Indeed, "[t]he approach used by the *Anderson* Court can be described as a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances." *Fulani v. Krivanek,* 973 F.2d 1539, 1543 (11th Cir. 1992). Thus, it is critical to evaluate the nature and degree of the burdens imposed by the provisions of the Amended Law to determine the appropriate level of constitutional scrutiny to apply.

The Amended Law contains a number of significant changes made in response to the decision in *LWVF I.* The first significant change in the Amended Law is the sharp reduction in the amount of potential fines. More importantly, it substantially reduces the total exposure of third-party voter registration organizations and their affiliates by imposing a $1,000 annual cap on the amount of fines that may be imposed. In combination, these provisions significantly reduce the concerns addressed in *LWVF I* that the fines could literally bankrupt a given organization.

Plaintiffs have nevertheless proposed a series of hypothetical scenarios that purport to demonstrate how the Amended Law may, somewhat implausibly, lead to the imposition of millions of dollars in crippling fines.  The factual scenarios leading to such fines, however, are highly speculative  –  relying on the possibility that hundreds of thousands of applications will be mishandled and that as a result, Defendants will indiscriminately impose the maximum possible fine on thousands of individuals and organizations.  Such assertions are neither supported by the record, nor, as discussed, consistent with the plain language of the Amended Law.  In any event, Plaintiffs' proffered "worst case scenarios" are not properly considered for purposes of this facial challenge. "In determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State Grange*, 128 S. Ct. at 1190.

The second significant change in the Amended Law is a provision that relaxes the Original Law's strict liability standard and eliminates fines where the failure to deliver the registration application promptly results from force majeure or impossibility of performance. *See* Fla. Stat. § 97.0575(3)(c).  Although Plaintiffs contend that this exception is exceedingly narrow, at a minimum it would appear to apply to many of the "worst -case scenarios" proffered by Plaintiffs, such as where collected voter registration applications are stolen by a third-party (*see June 18th Tr.* at 36:11-13), or where a storm disrupts delivery of collected applications (*see id.* at 110:11-19).  Moreover, the scope of this exemption is likely to be clarified during the rule-making process.

Finally, and perhaps most significantly, the Amended Law does not discriminate between the treatment of political parties and other third-party voter registration organizations.  In sharp contrast

to the Original Law, the Amended Law is facially neutral.[11]  All third-party organizations collecting voter registration applications are subject to the same regulations regarding the handling of voter registration applications.  Such content neutral election regulations are generally deemed to be significantly less constitutionally onerous that the facially discriminatory statute addressed in *LWVF I*.  *See, e.g.*, *Burdick*, 504 U.S. at 438 ("[W]e have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."); *Anderson*, 460 U.S. at 788 n.9 ("We have upheld generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.").

Taken together, these changes address the constitutional infirmities of the Original Law identified in *LWVF I*, and as a result, substantially reduce the alleged burdens imposed on Plaintiffs' First Amendment rights.  The undersigned concludes the Amended Law does not impose a "severe" burden on Plaintiffs' First Amendment rights.  Strict constitutional scrutiny is therefore inappropriate.  Instead, the Court will determine whether Defendants have presented "sufficiently weighty" regulatory interests to justify the limited burdens imposed on Plaintiffs' rights by the Amended Law.

### 2.     Florida's Interests in Support of the Amended Law

After evaluating the severity of Plaintiffs' asserted injury, the Court must identify and evaluate the "precise interests" put forward by Defendants as a justification for the Amended Law. *Anderson*, 460 U.S. at 789.  Defendants maintain the Amended Law is designed to address at least

---

[11] As previously discussed, the Amended Law only exempts individuals collecting applications from immediate family members, and  employees or agents collecting applications on behalf of the state agency.

43

three of Florida's legitimate regulatory interests: 1) ensuring that all voter registrations applications are properly and timely submitted; 2) holding third-party voter registration organizations accountable for the applications they collect; and 3) preventing instances of fraud.  As was recognized in *LWVF I*, "Defendants' stated interests are indisputably important and within the purview of the Florida legislature" because "'[t]he right to vote is fundamental, forming the bedrock of our democracy.'" *LWVF I*, 447 F. Supp. 2d at 1337 (quoting *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006)).

As a general matter, Plaintiffs accept the legitimacy of Florida's stated interests.  However, they contend that Defendants have failed to offer sufficient evidence to demonstrate those interests have been or are likely to be impaired by third-party voter registration activities.  Specifically, they contend Defendants have failed to proffer any evidence demonstrating there have been significant issues with respect to "hoarding" or the failure to submit applications prior to the "book-closing" deadline involving third-party voter registration organizations.  The undersigned finds Plaintiffs' contentions unpersuasive for a number of reasons.

First, and as previously detailed, Defendants have offered evidence of instances in which third-party voter registration organizations have "hoarded" applications (*see, e.g., Bradshaw Dep.* at 37:6-38:7; *Kolodny Dep.* at 85:20-86:1; *Korman Testimony* at 9, 14; *Snipes Dep.* at 104:14-25, 106:7-107:7, 140-1-20; *Sweat Testimony* at 6); failed to submit applications prior to the book-closing deadline (*see, e.g.*, *Bradshaw Dep.* at 38:7-8, 40:4-24; *Korman Dep.* 68:8-23; 69:8-21; 72:19-22, 77:23-79:3, 80:8-24); or even failed to submit applications at all (*see, e.g., Decl. of Records*

*Custodian*; *Korman Dep.* at 68:8-23; 69:8-21; 72:19-22).[12]  Second, having identified indisputably significant interests in ensuring that Florida voters are properly and timely registered, it is not clear that Defendants are required to submit affirmative evidence that third-party voter registration organizations have previously engaged in these actions for the Amended Law to survive this facial challenge.  "It is well established that, in the election context, there is no need for an 'elaborate, empirical verification of the weightiness of the State's asserted justifications.'"  *Florida State Conference of N.A.A.C.P. v. Browning*, 2008 WL 2567204, at *12 (N.D. Fla. June 24, 2008) (quoting *Timmons*, 520 U.S. at 364 (additional citation omitted)); *accord Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . .").

For example, in *Crawford*, the Supreme Court recently upheld Indiana's voter ID law despite the fact that there was "no evidence of any such fraud actually occurring in Indiana at any time in its history."  *Crawford*, 128 S. Ct. at 1619.  The Court premised this conclusion upon the fact that the threat posed by voter fraud was obvious because "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters [,] . . . the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process."  *Id.*  As the Court observed, "[w]hile the

---

[12]  In addition to the evidence submitted in connection with the evidentiary hearing, Defendants later filed a Notice of Filing Newly Available Evidence in Opposition to Plaintiffs' Motion for Preliminary Injunction [D.E. 77], attaching correspondence from the Supervisor of Elections of Broward County describing an incident in which a third-party organization failed to submit voter registration applications until months after they were collected.  Plaintiffs have moved to strike this evidence [D.E. 79].  Because this evidence is not necessary to support the conclusion that Defendants have demonstrated a significant state regulatory interest in the timely submission of voter registration applications, the Court has not considered it for purposes of this Order.

most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Id.*

Similarly, it is an obvious proposition not requiring extensive affirmative evidence that delayed or untimely submission of voter registration applications is likely to impair Defendants' interests in ensuring that Florida voters are registered to vote. Although there may be differing views concerning how best to address the mishandling of voter registration applications, that Florida has an interest in making sure its voters are timely and properly registered cannot reasonably be disputed. This observation, and the fact that Defendants have nevertheless proffered evidence of the very problems the Amended Law is designed to address, lead the Court to conclude that Florida's interests are "'sufficiently weighty to justify the limitation'" imposed on Plaintiffs' activities. *Id.* at 1616 (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

**3.     Extent to Which the Amended Law is Necessary to Protect Florida's Proffered Interests**

As discussed, there is no reasonable dispute regarding the legitimacy of Florida's interests in ensuring that voters are not disenfranchised by third parties' mishandling of, or failure to submit, voter registration applications. Plaintiffs nevertheless argue that even if those interests are implicated by the conduct of third-party voter registration organizations, the interests are already adequately protected by Section 104.0615(4), Florida Statutes, which makes it a felony to "knowingly . . . obstruct or delay the delivery of a voter registration form." Plaintiffs' assertion too narrowly construes the State's interests in regulating the handling of voter registration applications by third parties.

Florida's interests extend well beyond merely limiting knowing or willful actions that delay or obstruct the submission of voter registration applications. While the criminal statutes are aimed at preventing intentional acts that frustrate Florida's interests in ensuring voters are properly and timely registered, Florida's interests in protecting its voters are equally impaired by unintentional or negligent mishandling of registration applications.[13] The harm to a prospective voter whose application is submitted after the book-closing deadline, or whose application is not timely processed, is identical whether it is the result of an intentional act, mere neglect, or even an innocent mistake. The Amended Law addresses this threat to the voter by imposing civil sanctions for unintentional or negligent mishandling subject to limited exceptions, thereby alleviating concerns which are not addressed by Florida's existing criminal laws.[14] Thus, the undersigned rejects Plaintiffs' assertion that the Amended Law is not necessary to address Florida's interests in protecting its voters.

### C.    <u>Entitlement to a Preliminary Injunction</u>

For all of the reasons stated above, Plaintiffs have failed to demonstrate a likelihood of success on their facial challenge to the Amended Law. Because Plaintiffs do not satisfy the first prong of the injunctive relief standard, the Court need not address the remaining three prongs necessary to the grant of preliminary injunctive relief.

---

[13] Although no empirical information has been provided, the undersigned can well imagine that unintentional mishandling of voter registration applications would very well exceed the instances of intentional mishandling of applications by third-party groups.

[14] It may be more persuasively argued that the provisions of the Amended Law which impose higher fines for "willful" violations are redundant to the criminal sanctions under existing Florida law, although the burdens of proof for each are quite different.

Case No. 08-21243-CIV-ALTONAGA/Brown

## IV.  CONCLUSION

In accordance with the foregoing analysis, it is **ORDERED AND ADJUDGED** that

Plaintiffs' Motion for Preliminary Injunction **[D.E. 24]** is **DENIED**.  Plaintiffs' Motion to Strike

Defendants' Notice of Filing Newly Available Evidence **[D.E. 79]** is **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of August, 2008.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record